**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **TYLER FINNEGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 23-cv-12997-DJC** |
| | ) | |
| **MASSACHUSETTS COLLEGE OF** | ) | |
| **PHARMACY AND HEALTH SCIENCES,** | ) | |
| by and through the Board of Trustees, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    **November 13, 2024**

## I.    Introduction

Plaintiff Tyler Finnegan ("Finnegan") has filed this lawsuit against Defendant Massachusetts College of Pharmacy and Health Sciences ("MCPHS") challenging his dismissal from MCPHS's Pharmaceutical graduate program and asserting violations of Section 504 of the Rehabilitation Act ("Count I"), the American Disabilities Act ("ADA") ("Count II"), unfair and deceptive trade practices pursuant to Mass. Gen. L. c. 93A ("Count III"), breach of contract ("Count IV") and denial of basic fairness ("Count V"). D. 1. MCPHS has moved to dismiss all claims. D. 7. For the reasons stated below, the Court DENIES MCPHS's motion to dismiss as to Counts I and II, and ALLOWS the motion to dismiss Counts III-V, D. 7.

## II.    Standard of Review

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678). Although the "consideration of documents not attached to the complaint, or not expressly incorporated therein" is generally improper under Rule 12(b)(6), "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1993). Accordingly, the Court may review the "relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) (citation omitted).

III.    **Factual Background**

Except where otherwise noted, the following facts are drawn from the complaint, D. 1, and accepted as true for the purpose of resolving the motion to dismiss.

A.    **Finnegan Begins the Doctor of Pharmacy Program at MCPHS**

Finnegan began a six-year, graduate Doctor of Pharmacy program at MCPHS in the Fall 2016.  D. 1 ¶¶ 13, 15.  MCPHS is a private university that receives federal funding.  Id. ¶ 5.  Prior to attending MCPHS, Finnegan had taken classes at another university and MCPHS allegedly agreed to accept transfer course grades and credit.  Id. ¶ 14.

B.    **The MCPHS Student Handbook**

Upon acceptance to MCPHS, Finnegan received a copy of the MCPHS Student Handbook (the "Handbook") that outlined certain policies and procedures.[1]  Id. ¶ 16.  The Handbook contains an express disclaimer which states in relevant part that it "is not intended and cannot be construed as a contract or guaranty of any kind, express or implied, and the University may change, delete, or add to these guidelines unilaterally in its sole discretion and without notice" and that the "University also reserves the right to determine the applicability of any policy to a particular situation or set of circumstances and to depart from the guidelines contained herein in a given case."  D. 8-17 at 2.

---

[1] Finnegan did not attach the Handbook to the complaint but MCPHS attached excerpts from the Handbook as well as other documents to its motion to dismiss.  See D. 8.  Finnegan referenced the Handbook as well as his 93A demand letter in the complaint, see D. 1 at 3 n.1, ¶¶ 16-22, 64, 109, 128, 137, 141, 143, 145, 149, 162, and, therefore, these documents are properly considered by the Court on a 12(b)(6) motion to dismiss.  See Watterson, 987 F.2d at 3.  The other documents MCPHS submitted are not sufficiently referenced and incorporated into the complaint and, therefore, the Court is not relying upon those documents in deciding the pending motion to dismiss.

The Handbook outlined certain provisions relating to taking and withdrawing from a course.  D. 1 ¶¶ 17, 18.  The Handbook stated that a student may attempt a course "no more than two times" and that "[s]tudents may withdraw from a course through the end of the 10th week of the fall or spring semester."  Id.  The Handbook states that after the "official add/drop period, students who choose to withdraw receive a grade of W for the course."  Id. ¶ 19.

The Handbook addressed how students receive transfer credit prior to acceptance.  D. 8-2 at 2.  The Handbook stated, in relevant part, that "[c]ourses taken at other regionally accredited colleges or universities in the United States before the student was accepted to the University may receive MCPHS transfer credit provided that a minimum grade of C has been earned."  Id.

The Handbook also contained provisions relating to taking a leave of absence, D. 1 ¶ 20, and the procedure for seeking same.  D. 8-16 at 2.  In addition to the steps for seeking a general leave of absence, student seeking a health/medical leave of absence, "must submit medical documentation from the student's medical provider to the Office of Student Affairs," such "documentation must indicate the medical reasons the student is unable to attend classes for the requested time period," and "the student must meet with representatives from Student Affairs on their respective campus and complete appropriate paperwork."  Id. at 3.

The Handbook contained provisions relating to academic dismissal including that a student who has been dismissed may be reinstated.  Id. ¶ 22; D. 8-5 at 2.  The Handbook provided that "[c]ourses may be attempted no more than two times.  Grades of F and W are considered attempts for courses in which D or better is the passing grade."  D. 8-5 at 2.  The Handbook further provided that "[i]f a student's GPA falls below the level of good academic standing, as defined by the program requirements, for two consecutive academic semesters, the [Academic Standing

Committee] will submit a recommendation for dismissal from the program to the appropriate school dean." Id.

### C.      Finnegan's Request for Transfer Credit

In 2018, Finnegan met with Associate Dean of Student Engagement and Success, Steven Crosby ("Dean Crosby") to discuss his academic schedule. D. 1 ¶ 30. Finnegan was allegedly informed for the first time that although he received transfer credit for his prior elective courses, the grades did not transfer for the purposes of being calculated into his GPA. Id. ¶ 31. Finnegan alleges that because the grades did not transfer, he chose to add additional electives to his schedule and retake certain courses. Id. ¶ 33.

In Spring 2019, Finnegan met with Associate Dean of Pharmacy Experiential Education Paul DiFrancesco ("Dean DiFrancesco") and Dean Crosby concerning his grades. Id. ¶ 35. During this meeting, Finnegan requested that his Organic Chemistry II grade he received from Salem State University, in which he earned an A-, replace the D grade he received for the same course at MCPHS. Id. ¶ 36. Finnegan alleges that Dean DiFrancesco granted approval of the grade switch and told Finnegan to submit a formal request, which Finnegan claims he submitted to Dean Crosby in-person. Id. ¶¶ 37-38. Finnegan alleges that despite this approval, his released grades for the semester continued to reflect the D grade. Id. ¶ 39.

### D.      Finnegan Develops Chronic Migraines and Takes a Leave of Absence

Prior to the start of the Fall 2019 semester, Finnegan was hospitalized and diagnosed with chronic migraines.[2] Id. ¶¶ 41-42. Finnegan communicated his recent diagnosis with MCPHS and

---

[2] MCPHS disputes the date, noting that in a subsequent communication Finnegan stated that he became disabled in Fall 2020, see D. 8 at 8, but the Court accepts the allegation in the complaint as true for the purposes of deciding the motion to dismiss.

submitted all necessary paperwork.  Id. ¶ 42.  Finnegan claims that no one from MCHPS followed up with him concerning additional accommodations at that time.  Id.

Since he allegedly continued to suffer from migraines throughout that semester, he met with Dean Crosby to discuss his courseload.  Id. ¶¶ 43-45.  Finnegan states that Dean Crosby told him that he would not be penalized for his condition and that he could retake any missed classes in the Fall and he should focus on improving his health.  Id. ¶ 46.  As Finnegan's condition did not improve, he met again with Dean Crosby who advised Finnegan to take a leave of absence ("LOA") for the rest of the semester.  Id. ¶¶ 47-48.  Finnegan alleges that Dean Crosby told him that he would "take care" of Finnegan and handle logistics with MCPHS.  Id. ¶ 50.  Finnegan took a LOA based on his conversation with Dean Crosby.  Id. ¶¶ 49, 51.  Finnegan states that Dean Crosby did not report that Finnegan had taken a LOA and as a result Finnegan received Fs in his classes instead of withdrawals ("Ws") that he should have received.  Id. ¶ 52.

Finnegan returned for the Fall 2020 semester and enrolled to retake the spring classes but midway through again decided to take a LOA based upon his medical condition as well as personal family issues.  Id. ¶¶ 53-55, 57.  Finnegan again met with Dean Crosby and provided him directly with a letter from his medical provider concerning his migraines to demonstrate his medical condition and need for aid.  Id. ¶¶ 56-57.  Finnegan states that Dean Crosby again told him that he would "take care" of him.  Id. ¶ 58.

### E.      Finnegan is Dismissed from MCPHS

Finnegan returned in the Spring 2021 after receiving more effective treatment for his migraines and his grades improved.  Id. ¶¶ 60-62.  Finnegan noted that his transcript reflected Fs for the courses he had been previously enrolled in during Spring 2020 when he took his LOA.  Id. ¶ 63.

Finnegan enrolled in the Fall 2021 courses and completed the semester.  Id. ¶ 65.  In December 2021, MCPHS sent an email to students after final examinations which stated that any student who did not pass the Fall 2021 semester would be permitted to continue to the Spring 2022 semester due to the impact of Covid-19.  Id. ¶ 66.  On or around December 16, 2021, MCHPS dismissed Finnegan from school based upon his allegedly poor academic performance.  Id. ¶ 68.  Finnegan believes the dismissal was in error because his transcript still reflected Fs from his LOA.  Id. ¶ 69.  Finnegan notes that the dismissal letter referred to his chronic migraines as a "personal struggle."  Id. ¶ 71.  Finnegan was dismissed without warning and was told that the December 2021 email did not apply to him.  Id. ¶¶ 72-73.

On April 12, 2022, Finnegan met with MCPHS to discuss several topics relating to his dismissal, including why his transcript reflected Fs and did not reflect the withdrawal due to his LOA.  Id. ¶ 74.  Finnegan was advised that he could not appeal his academic dismissal but he could appeal his grade.  Id. ¶ 75.  Finnegan appealed the grades and has not received a response from MCPHS concerning his appeal.  Id. ¶¶ 76-78.  At the time of his dismissal, Finnegan had completed four years of the six-year program and had incurred more than $199,000 in student debt and paid approximately $43,000 out of pocket.  Id. ¶ 117.

## IV.    Procedural History

Finnegan instituted this action on December 6, 2023.  D. 1.  MCPHS filed a motion to dismiss as to all claims, D. 7.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 14.

## V.     Discussion

### A.     Finnegan States Plausible Claims for Violations of Section 504 of the Rehabilitation Act and the ADA (Counts I and II)

Finnegan challenges his dismissal from MCHPS and asserts that MCPHS discriminated against him on the basis of having a disability because he was not provided with the proper accommodations which ultimately resulted in his dismissal in violation of the ADA and Section 504 of the Rehabilitation Act.  See D. 1 ¶¶ 92-123.

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).  "A Section 504 claim requires a plaintiff to plausibly allege four elements:  (1) that he is disabled; (2) that he sought services from a federally funded entity; (3) that he was otherwise qualified to receive those services; and (4) that he was denied those services solely by reason of . . . his disability."  Shulse ex rel. Shulse v. W. New Eng. Univ., No. 19-cv-30146-KAR, 2020 WL 4474274, at *5 (D. Mass. Aug. 4, 2020) (internal quotation marks omitted) (quoting Lesley v. Hee Man Chie, 250 F.3d 47, 52-53 (1st Cir. 2001)).

To prevail on an ADA claim, a plaintiff must show that "(1) [he] is disabled within the meaning of the ADA; (2) he is otherwise qualified for participation in the program; (3) he made a request for a reasonable accommodation; and (4) [the defendant] denied the request."  Brown v. Suffolk Univ., No. 19-cv-40062-DHH, 2021 WL 2785047, at *3 (D. Mass. Mar. 31, 2021) (internal quotation marks and citation omitted).  Courts have recognized that the ADA and Section 504 "are "generally governed by the same standards."  See id. at *4; D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 39-40 (1st Cir. 2012).  Accordingly, the Court will analyze both claims together.

8

MCHPS contends that Finnegan cannot establish an ADA or Section 504 claim because (1) he was not a qualified individual within the meaning of the ADA and he was not dismissed solely for being disabled as required under Section 504 and (2) he never requested a reasonable accommodation.  D. 8 at 3.

    *1.    Qualified Individual*

MCPHS argues that Finnegan was not an otherwise qualified individual and he was not dismissed solely on the basis of his disability because he was dismissed based on his academic performance.  See D. 8 at 12, 15-16.  MCPHS contends that Finnegan was previously dismissed from the program three times due to his academic performance, and therefore, this fourth dismissal was unrelated to his disability because he already was not meeting the program requirements.  Id. at 12.  Finnegan contends that whether he was dismissed prior does not bear on the dismissal in this dispute because MCPHS failed to provide him with reasonable accommodations to help him succeed academically.  D. 11 at 13.  "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."  Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 22 (1st Cir. 1991) ("Wynne I") (internal quotation marks and citation omitted).  When determining if a plaintiff is otherwise qualified, "it is necessary to take into account the extent to which reasonable accommodations that will satisfy the legitimate interests of both the school and the student are (or are not) available and, if such accommodations exist, the extent to which the institution explored those alternatives."  Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 792 (1st Cir. 1992) ("Wynne II").

Although a close question, drawing all inferences in Finnegan's favor as required at this stage, the Courts concludes that Finnegan has alleged at least some facts supporting that he could meet MCPHS's program requirements with reasonable accommodations.  See D. 1 ¶¶ 28, 42-46,

60-62, 70, 95-97, 112-14.  The Court notes that MCPHS's argument, that Finnegan could not qualify because he was previously dismissed three times for academic issues, see D. 8 at 6-7, 11-12, 15-16, presents a factual question that is not suitable for resolution at the motion to dismiss.[3] Shulse, 2020 WL 4474274, at *6 (concluding that whether plaintiff was dismissed for poor academic performance was a factual question not suitable on a motion to dismiss because plaintiff may be able to prove that his performance would have been different if he had reasonable accommodations).

### 2. *Request for Reasonable Accommodation*

MCPHS contends that Finnegan did not properly request a reasonable accommodation because he did not follow the proper procedures for requesting a LOA or for any other accommodation.  D. 8 at 12-14, 16.  "The ADA's reasonable accommodation requirement usually does not apply unless triggered by a request."  Brown, 2021 WL 2785047, at *4  (internal quotation marks and citation omitted).  To make a reasonable accommodation request, the academic institution must know or be reasonably expected to know of the student's handicap.  Wynne II, 976 F.2d at 795.  "A relevant aspect of this inquiry is whether the student ever put the [graduate]

---

[3] The Court notes that MCPHS argued that it is entitled to academic deference in determining whether Finnegan was a qualified individual that met MCPHS's academic requirements.  D. 8 at 10-12, 15-16.  At the motion to dismiss stage, however, the deference owed to a university does not override the Court's duty to draw all reasonable inferences in favor of plaintiff.  See Shulse, 2020 WL 4474274, at *6 (concluding that plaintiff had plausibly alleged that he was otherwise qualified for the graduate program and declining to grant such deference where the court was obligated to draw all reasonable inferences in the plaintiff's favor at the motion to dismiss stage).

school on notice of his handicap by making a sufficiently direct and specific request for special accommodations." Id. (internal quotation marks and citation omitted).

Here, Finnegan alleges that MCPHS was on notice of his disability because, prior to the commencement of classes in Fall 2019, he communicated his diagnoses to MCHPS and "submitted all the necessary paperwork," and he provided MCPHS with a letter from his medical provider "demonstrat[ing] his medical condition and need for aid." D. 1 ¶¶ 42, 56. Finnegan alleges that in response to these conversations with Dean Crosby that he was advised to take a leave of absence. Id. ¶¶ 46, 57. Finnegan also alleges that Dean Crosby informed him that he "would be permitted extra time on additional days" for test taking which allegedly did not occur. Id. ¶ 70. MCPHS disputes that Finnegan made a proper request because MCPHS claims that Finnegan did not respond to or follow up with the Office of Student Access & Accommodation ("OSAA"), which handles accommodation requests, and OSAA contacted him five times to see how best to accommodate Finnegan after notice of his disability. See D. 8 at 2, 8-9 (relying on various documents), 13-14 (same). Whether Finnegan followed the school procedures in making a reasonable accommodation is beyond the allegations in the complaint (which the Court must presume to be true for the purposes of resolving the motion to dismiss) that he made such request and MCPHS did not provide it even as he was led to believe by Dean Crosby that it would. Because Finnegan has alleged that he would be granted additional time on examinations which did not occur, and provided a medical letter stating his need for aid, at the motion to dismiss stage, he has alleged sufficient facts that he requested an accommodation that was not provided. Accordingly, the Court denies the motion to dismiss Counts I and II.

**B.     Finnegan Does Not Allege a Plausible Chapter 93A Claim (Count III)**

Finnegan asserts that MCPHS engaged in unfair and deceptive trade practices in violation of Mass. Gen. L. c. 93A because MCPHS sought payments from Finnegan for classes that they knew, or should have known, he had already completed or that he had already withdrawn from. D. 1 ¶¶ 129-30.  MCPHS contends that Finnegan has not stated a plausible 93A claim because (1) Finnegan did not provide a demand letter, a procedural prerequisite to filing suit, and (2) the statute does not apply to MCPHS as a private, non-profit educational institution because academic dismissal does not constitute "any trade or commerce." D. 8 at 16-17.  The Court agrees.

Chapter 93A requires a plaintiff to serve a written demand letter on a prospective defendant at least thirty days prior to filing an action.  Mass. Gen. L. c. 93A § 9(3); Hugenberger v. Alpha Mgmt. Corp., 83 Mass. App. Ct. 910, 911 (2013).  "The purpose of the demand letter requirement is to 'put[ ] the defendant on notice of the plaintiff's claim, thereby encouraging negotiation and settlement.'" Costa v. FCA US LLC, 542 F. Supp. 3d 83, 99 (D. Mass. 2021) (quoting Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 34 (1st Cir. 2016)).  Here, Finnegan alleges that he sent a demand letter to MCPHS, D. 1 ¶ 128.  That demand letter, sufficiently incorporated by reference into the complaint, which Finnegan sent to MCPHS on September 2, 2022, however, is entitled "Notice of Demand- Claims Under 42 U.S.C. § 1983," D. 8-1 at 2, alleges a violation of § 1983 for an alleged failure to provide due process and does not cite to or assert claims under 93A.  See D. 8-1 at 1, 5.  Although a demand letter "does not require claimants to set forth every specific statutory or regulatory violation alleged" so long as it provides fair notice of the actions or practices that caused the plaintiff injury, Casavant v. Norwegian Cruise Line Ltd., 460 Mass. 500, 506 (2011), relief "on actions not so mentioned [in the demand letter] is foreclosed as a matter of law." Passatempo v. McMenimen, 461 Mass. 279, 300 (2012) (internal citation and quotation marks omitted).  Here, the letter is devoid not only of any c. 93A claim, but also the alleged factual basis

for the 93A claim asserted here (which, as alleged in the complaint, is the unfair and deceptive act of MCPHS having "sought payments from [Finnegan] for classes it knew or should have known, [he] had already completed" and "sought payments from [Finnegan] for classes it knew, or should have known, [he] had properly withdrawn from," D. 1 ¶¶ 129-30), and, therefore, MCPHS was not on notice of Finnegan's 93A claim.  See D. 8-1; Fitzhugh v. HSBC Bank USA, Nat'l Assoc., No. 19-cv-12394-FDS, 2020 WL 7075123, at *6 (D. Mass. Dec. 3, 2020), aff'd sub nom. Fitzhugh v. HSBC Bank USA, N.A., Nat'l Ass'n as Tr. for Fremont Home Loan Tr. 2005-D, Mortg.-Backed Certificates, Series 2005D, No. 21-1022, 2023 WL 9111287 (1st Cir. Dec. 12, 2023) (ruling that plaintiff cannot bring a 93A claim based on allegations that were not included in the 93A demand letter).

Even if he had served a 93A demand letter, Finnegan's 93A claim also otherwise fails because MCPHS was not engaging in "trade or commerce" within the meaning of 93A.  Cf. Linkage Corp. v. Tr. of Bos. Univ., 425 Mass. 1, 26 (1997) (noting that "[i]n most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission").  The First Circuit has observed that "the words trade and commerce in ch. 93A, § 1(b) do not traditionally mean the provision of education to students at a not-for-profit college."  Squeri v. Mount Ida Coll., 954 F.3d 56, 73-74 (1st Cir. 2020) (internal quotation marks omitted) (dismissing 93A claim because the alleged acts were committed in furtherance of the college's education mission).  Here, Finnegan complains that MCPHS engaged in unfair and deceptive practices for accepting tuition when it knew or should have known that he had already completed such classes or had properly withdrawn from them.  D. 1 ¶¶ 129-30.  These practices fit within MCPHS's core educational missions of providing an education to its students and, therefore, do not fall under the ambit of chapter 93A.  See Brodsky v. New Eng. Sch. of L.,

617 F. Supp. 2d 1, 7 (D. Mass. 2009) (ruling that plaintiff did not state a 93A claim based on graduate school's decision not to allow him to retake courses he failed because the school's decision was part of the university's core mission of providing education and was not engaging in trade or commerce); <u>Cooney v. Saybrook Graduate Sch. & Rsch. Ctr.</u>, No. 04-cv-11572-JLT, 2007 WL 9797535, at *2 (D. Mass. July 17, 2007) (concluding that plaintiff did not state a 93A claim when she claimed that school engaged in unfair practices by accepting tuition even after learning that the Massachusetts board had adopted new regulations for licensure of psychologists because "[r]eceiving tuition from its students is central to [defendant's] core mission as a non-profit graduate school").  Accordingly, the Court dismisses Count III.[4]

### C.    <u>Finnegan Does Not Allege a Plausible Breach of Contract Claim (Count IV)</u>

Finnegan argues that MCPHS breached its contractual agreements with him because when Finnegan paid for tuition at MCPHS he expected he would be receiving an equal and discrimination free education. D. 11 at 14-16; <u>see</u> D. 1 ¶¶ 137, 140, 143-44, 146-48, 151.  Finnegan alleges that MCPHS committed several breaches of its agreements with him primarily based on various Handbook provisions concerning:  (1) MCPHS's failure to withdraw Finnegan from the courses which resulted in Finnegan getting Fs instead of Ws, D. 1 ¶ 143; (2) charging Finnegan for courses he withdrew from, <u>id.</u> ¶ 144; (3) failing to provide proper accommodations to Finnegan for examinations, <u>id.</u> ¶ 146; (4) failing to refer Finnegan for further accommodations, <u>id.</u> ¶ 147; and (5) dismissing Finnegan due to a medical condition, <u>id.</u> ¶ 148.  Finnegan also alleges a breach

---

[4] The Court disagrees with Finnegan's argument that his claim is analogous to the employment contract in <u>Iconics, Inc. v. Volpe Indus.</u>, No. SU-cv-2009-00361-BLS2, 2009 Mass. Super. LEXIS 434, at *13-14 (Mass. Super. Ct. Dec. 14, 2009) in which the court declined to dismiss a 93A claim based on a tortious interference with contract as <u>Iconics</u> does not concern the educational setting, there is no analogous employment contract here as discussed further above, and, therefore, <u>Iconics</u> does not warrant a different conclusion her.

of contract based on the December 2021 email circulated to students after final examinations that promised students who did not pass the Fall 2021 semester that they would be permitted to continue to the Spring 2022 semester.  Id. ¶¶ 149-151.  MCPHS argues that Finnegan's breach of contract claim should be dismissed because (1) the Handbook is not a contract, (2) the December 2021 email promising continued enrollment to any student that failed the semester is not a contract and (3) that Finnegan has failed to plead any reasonable expectations that were violated by MCPHS arising out of any supposed contract.  D. 8 at 17.

       *1.*    *The Handbook*

"To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage."  Shulse, 2020 WL 4474274, at *9 (internal citation and quotation marks omitted).  "[I]n the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties."  Durbeck v. Suffolk Univ., 547 F. Supp. 3d 133, 145 (D. Mass. 2021) (quoting Squeri, 954 F.3d at 71).  The plaintiff must "state with substantial certainty the facts showing the existence of the contract and the legal effect thereof."  Id. (internal quotations and citation omitted).

Massachusetts courts recognize that "[a] student-university relationship is essentially a contractual one."  Govan v. Trs. of Bos. Univ., 66 F. Supp. 2d 74, 82 (D. Mass. 1999).  The terms that forms the basis for the contract "can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials."  Guckenberger v. Bos. Univ., 974 F. Supp. 106, 150 (D. Mass. 1997).  Whether a "[student handbook] always constitutes a contract is, arguably, an unsettled issue under Massachusetts law."  Walker v. President & Fellows of Harvard Coll., 840 F.3d 57, 61 n.5 (1st Cir. 2016) (comparing cases which have held

whether a student handbook constitutes a contract between the student and the school); see G. v. Fay Sch., 931 F.3d 1, 12 (1st Cir. 2019) (reasoning that courts determine whether a student handbook is contractually enforceable by examining whether the parties entered in a valid and binding agreement).  If a contract is established, the Court reviews the breach of contract claim by "examining the terms of the contract established between the college and the student and ask[ing] whether the reasonable expectations of the parties have been met."  Sonoiki v. Harvard Univ., 37 F.4th 691, 704 (1st Cir. 2022) (internal quotation marks and citation omitted).  At the motion to dismiss stage, the reasonable expectation standard is focused on the student's interpretation of the contract's terms, which allows for a student's reasonable expectations to be different from the interpretation that the university would place on the same terms.  Id. at 709.

MCPHS argues that the Handbook cannot establish a contract because it contains an express disclaimer that the Handbook "is not intended and cannot be construed as a contract or guaranty of any kind, express or implied, and the University may change, delete, or add to these guidelines unilaterally in its sole discretion and without notice."  See D. 8 at 18; D. 8-17 at 2.  The Court agrees.  Courts have held that where there is an express disclaimer in a student handbook or catalog in which the University retains unilateral rights to make changes without notice, any promises premised on that document are rendered illusory.  See Durbeck, 547 F. Supp. 3d at 147 (concluding that such disclaimer in the undergraduate academic catalog renders any promise premised on that document illusory); Pacella v. Tufts Univ. Sch. of Dental Med., 66 F. Supp. 2d 234, 241 (D. Mass. 1999) (holding that the student handbook terms were not contractually binding because the express disclaimer in the student handbook permitted the school to make unilateral changes); Fay Sch., 931 F.3d at 13 (concluding that the language in the handbook which stated that it "does not constitute a contract between [them] and the [s]chool" did not form a binding

contract) (internal quotation marks omitted); see also Gibson v. Walden Univ., LLC, 66 F. Supp. 3d 1322, 1325 (D. Or. 2014) (ruling that university student handbook did not constitute a contract where it "expressly disclaims the formation of a contract"). Here, the Handbook expressly states that MCPHS retains exclusive control to "unilaterally in its sole discretion and without notice" to change any policy in the Handbook, D. 8-17 at 2, and therefore, the Handbook does not constitute a contract. See Pacella, 66 F. Supp. 2d at 241. As Finnegan relies upon the Handbook to assert his breach of contract claims for transfer credit, withdrawal and reasonable accommodation, he cannot state a plausible claim. See D. ¶¶ 141-48.

Alternatively, even if the given language in the Handbook was a contract, there is no plausible basis for a breach of same its terms concerning withdrawal, taking a leave of absence and transfer credit. The Handbook expressly stated that a student may attempt a course "no more than two times" and that "[s]tudents may withdraw from a course through the end of the 10th week of the fall or spring semester." D. 1 ¶¶ 17, 18. The Handbook further states that after the "official add/drop period, students who choose to withdraw receive a grade of W for the course." Id. ¶ 19. The Handbook also sets forth the requisite procedure for taking a leave of absence, which included filing appropriate paperwork. Id. ¶ 20; D. 8-16 at 2-3. The provision indicated that students who take a leave of absence would receive a "W" for the course. See D. 8-16 at 2. Here, although the complaint alleges that Finnegan withdrew from classes and took a leave of absence based on a conversation with the Dean, the Handbook provided that Finnegan was required to file a LOA form within one week with the requisite signatures for a standard LOA and complete appropriate paperwork for a health and medical LOA. D. 8-16 at 2-3; Bleiler v. Coll. of Holy Cross, No. 11-cv-11541-DJC, 2013 WL 4714340, at *15 (D. Mass. Aug. 26, 2013) (reasoning that there is no breach of the student handbook where the college complied with the reasonable expectations

generated by the student handbook and related documents).  Finnegan does not allege that he completed any of these steps, and Finnegan alleges that he attempted classes again that he had withdrawn from, D. 1 ¶ 53, and therefore, MCPHS cannot be said to be in breach of the reasonable expectations provided by the Handbook for withdrawing from classes and taking a leave of absence.

Finnegan's argument concerning transfer credits does not provide a plausible basis for an alleged breach of contract.  The Handbook expressly provided that "[c]ourses taken at other regionally accredited colleges or universities in the United States before the student was accepted to the University may receive MCPHS transfer credit provided that a minimum grade of C has been earned."  D. 8-2 at 2.  Contrary to Finnegan's assertions, there was no provision in the Handbook that provided that Finnegan would receive the letter grade transferred from a course at another college or university as opposed to getting the transfer credit for same, and MCPHS, accordingly, cannot be alleged to be in breach of the Handbook on such basis.  See Bleiler, 2013 WL 4714340, at *16.  Accordingly, the Court dismisses the breach of contract claim based on the Handbook.[5]

### 2.    December 2021 Email and Oral Agreements

Finnegan also asserts that MCPHS breached an agreement contained in a December 2021 email, which allegedly stated that any student who did not pass the Fall 2021 semester would be permitted to continue to the Spring 2022 semester due to the impact from Covid-19, by dismissing

---

[5] Finnegan alludes to other alleged breaches in the complaint by stating that the breaches specified in the complaint comprise a "non-exhaustive" list, see D. 1 ¶ 140, but because these allegations are solely alleged in conclusory terms, these allegations do not defeat the motion to dismiss.  Doe v. Stonehill Coll., Inc., 55 F.4th 302, 333 (1st Cir. 2022) (recognizing that the court "need not accept allegations too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture") (internal quotation marks and citation omitted).

Finnegan for academic performance.  D. 1 ¶¶ 66-68, 149-51.  MCPHS argues that this email was not supported by any consideration, which is required to form a contract.  D. 8 at 19; see Doe v. Trs. of Bos. Coll., 892 F.3d 67, 89 (1st Cir. 2018) (noting that the essential elements for the formation of a contract under "Massachusetts law consist of an offer, acceptance, and consideration").  Consideration requires "bargained-for exchange" in which there is a "legal detriment of the promisee or a corresponding benefit to the promisor."  Trs. of Bos. Coll., 892 F.3d at 89 (internal quotations and citation omitted).  Here, Finnegan does not allege what consideration was exchanged.  See D. 1 ¶¶ 66-68, 149-51.  Without consideration, the December 2021 email is not a valid contract and cannot support a breach of contract claim.  See Trs. of Bos. Coll., 892 F.3d at 89 (concluding there was no enforceable contract from written communications with the school president concerning dismissal because there was no consideration).

Finnegan's claims that MCPHS also breached certain oral promises that Dean Crosby made to "take care" of Finnegan's leave of absence and accommodation requests fail for the same reasons.  See D. 1 ¶ 146; D. 11 at 15.  Finnegan has not supported these alleged oral agreements with consideration and, therefore, has not established that these conversations constituted an oral contract.  See Trs. of Bos. Coll., 892 F.3d at 89; see also Gibson, 66 F. Supp. 3d at 1326 (reasoning that alleged oral promise did not constitute an enforceable agreement because, among other things, plaintiff did not allege that it was supported by consideration).[6]

### D.  Finnegan Does Not Allege a Plausible Denial of Basic Fairness (Count V)

MCPHS contends that Finnegan has not pled a plausible claim based on a denial of basic fairness because (1) Finnegan was not contractually entitled to a hearing and cannot invoke the

---

[6] At oral argument, Finnegan contended that even if there was no contract, Finnegan had plausibly pleaded detrimental reliance.  As the Court noted at the hearing, detrimental reliance was not alleged in the complaint and, accordingly, is not considered as to the pending motion to dismiss

standard for basic fairness in evaluating whether the university breached the covenant of good faith in conducting said hearing and (2) if Finnegan intended to plead that MCPHS breached the implied covenant of good faith and fair dealing, Finnegan has failed to show that MCPHS violated the reasonable expectations of the parties under any contract in his dismissal.  D. 8 at 21-23.

### 1.  Basic Fairness

MCPHS argued that Finnegan's allegations that he was denied basic due process by not having a formal hearing and an opportunity to present his account prior to his dismissal fail as a matter of law.  See D. 8 at 21-23; D. 1 ¶¶ 102, 119, 156, 166.  The First Circuit has recognized that a denial of basic fairness is a recognized theory of recovery, but the "precise contours of such a claim are yet to be clearly defined."  Sonoiki, 37 F.4th at 714.  The claim is closely intertwined with the breach of contract and the Court considers whether the school's procedures for adjudicating the dispute and student's dismissal was conducted with basic fairness, meaning that "at a minimum, the school complied with the express procedures laid out in the policies" that allegedly formed the contract.  Id. at 714-15.  Evaluating fairness, therefore, can "be viewed as one of the reasonable expectations a student has about the disciplinary process."  Id. at 715.  The Court recognizes that in Massachusetts "courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities."  Id. at 715 (internal quotation marks and citation omitted).

Here, Finnegan has not pointed to any provision in the Handbook or otherwise that provides that MCPHS is required to provide a hearing or opportunity for him to set forth his account prior to dismissal.  See generally D. 1.  Without pointing to a provision in the Handbook that provided

---

the complaint.  Peter Pan Bus Lines, Inc. v. Greyhound Lines, Inc., 189 F. Supp. 3d 217, 225 (D. Mass. 2016) (citing cases declining to consider arguments raised for the first time at oral argument).

for a hearing, Finnegan could not have had a reasonable expectation of a hearing and "has not shown [the Court] how these allegations breached the promises of basic fairness in the contract." Sonoiki, 37 F.4th at 716 (affirming dismissal of the denial of basic fairness claim); see also Doe v. Trs. of Bos. Coll., 942 F.3d 527, 533-36 (1st Cir. 2019) (citing Coveney v. President & Trs. of Coll. of Holy Cross, 388 Mass. 16, 21–22 (1983) for conclusion that a student at a private university is not entitled to federal due process to meet the basic fairness requirement in disciplining students).

Moreover, Finnegan has not adequately alleged that MCPHS acted arbitrary or capriciously in conducting his dismissal as MCPHS stated he could appeal his grades, and Finnegan followed the procedure for filing an appeal. See D. 1 ¶¶ 75-76. Finnegan alleged that in his appeal he shared the correspondence with Dean Crosby concerning the grade from Organic Chemistry II that he completed at a different institution, but MCPHS did not act on his appeal. Id. ¶¶ 77-78. As discussed above, however, Finnegan has not pointed to any provision in the Handbook or otherwise that provides that the letter grade from a different university will be credited, but only that transfer credit may be awarded, D. 8-2 at 2, and therefore, even assuming the truth of the allegations in the complaint, Finnegan has not plausibly alleged that he was denied basic fairness for MCPHS not providing him the relief that he sought as to his grade. Accordingly, the Court holds that he has not plausibly pled that he was denied basic fairness or a fair adjudication of his dismissal because MCPHS did not hold a hearing concerning his dismissal. Sonoiki, 37 F.4th at 716.

### 2. *Implied Covenant of Good Faith and Fair Dealing*

To the extent Finnegan bases his claim for denial of basic fairness on the implied covenant of good faith and fair dealing arising from the Handbook as a contract, that claim also fails. Courts

have acknowledged that a school's "independent duty to provide basic fairness" is rooted in "the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law." See, e.g., Sonoiki, 37 F.4th at 715 (internal quotation marks and citation omitted).  However, "[t]he implied covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship."  Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 612 (D. Mass. 2016).  In determining whether the covenant of good faith and fair dealing was breached, courts use the same analysis as in a breach of contract and look to the reasonable expectations of the parties.  Id.  "Establishing a violation of the implied covenant further requires proof of at least bad faith conduct."  Kestenbaum v. President & Fellows of Harvard Coll., No. 24-cv-10092-RGS, 2024 WL 3658793, at *8 (D. Mass. Aug. 6, 2024) (internal quotation marks and citation omitted).  Here, as discussed above, the Handbook did not create a contractual relationship and, therefore, Finnegan has not alleged plausible facts that MCPHS violated any contract, and he cannot establish a claim based on a violation of an implied covenant of good faith and fair dealing of same.  See Doe v. Town of N. Andover, No. 20-cv-10310-IT, 2023 WL 3481494, at *14 (D. Mass. May 16, 2023) (reasoning that a claim for denial of basic fairness is akin to a breach of good faith and fair dealing and where plaintiff's claim for denial of basic fairness "tracks the contract argument and where there is no enforceable contract, a claim for denial of basic fairness also fails").

Accordingly, Finnegan also has not plausibly alleged a claim based on a breach of an implied covenant of good faith and fair dealing.

**VI.     Conclusion**

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss as to Counts I  (Rehabilitation Act claim) and II (ADA claim) and ALLOWS the motion to dismiss as to the remaining claims, Counts III-V, D. 7.[7]

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

[7] The Court notes that at oral argument, Finnegan made a request to amend the complaint concerning any areas that may "need to be enhanced or beefed up," but provided no information to suggest that such proposed amendments would not be futile and, on this basis, the Court denies such request.