**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **TYLER FINNEGAN,**<br><br>        **Plaintiff,**<br><br>        v.<br><br>**MASSACHUSETTS COLLEGE OF**<br>**PHARMACY AND HEALTH SCIENCES,**<br>by and through the Board of Trustees,<br><br>        **Defendant.** | **Case No. 23-cv-12997-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C. J.**                                                                                       **June 16, 2026**

## I.     Introduction

Plaintiff Tyler Finnegan ("Finnegan") filed this lawsuit against Defendant Massachusetts College of Pharmacy and Health Sciences ("MCPHS") challenging his dismissal from MCPHS's Pharmaceutical graduate program and asserting violations of Section 504 of the Rehabilitation Act ("Count I"), the Americans with Disabilities Act ("ADA") ("Count II"), unfair and deceptive trade practices pursuant to Mass. Gen. L. c. 93A ("Count III"), breach of contract ("Count IV") and denial of basic fairness ("Count V"). D. 1.  On November 13, 2024, the Court denied MCHPS's motion to dismiss as to Counts I and II and allowed the motion to dismiss as to the remaining claims, Counts III-V.  D. 15.  MCPHS has now moved for summary judgment as to Counts I and II.  D. 30.  For the reasons stated below, the Court ALLOWS MCPHS's motion.  Id.

1

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F. 3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F. 3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F. 3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano– Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F. 3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

Except where otherwise noted, the following facts are drawn from MCPHS's statement of facts, D. 32, Finnegan's response and additional statement of facts, D. 35, MCPHS's response, D. 40, and the exhibits and documents referenced therein.

In Fall 2016, Finnegan began a six-year graduate Doctor of Pharmacy program ("PharmD Program") at MCPHS.  D. 32 ¶¶ 1, 3; D. 35 ¶¶ 1, 3.  While Finnegan was enrolled in the PharmD Program, the program began with a two-year pre-professional phase, the successful completion of which required students to, among other components, attain a minimum grade point average

2

("GPA") of 2.7 and a minimum grade of a "D" in all courses.  D. 32 ¶¶ 2-3; D. 35 ¶¶ 2-3.  Once a student successfully completed the pre-professional requirements, the student entered the four-year professional phase, the successful completion of which required students to attain a GPA of 2.7 and a minimum grade of a "C-" in all courses.  D. 32 ¶¶ 5-7; D. 35 ¶¶ 5-7.  In both phases of the PharmD Program, if a student's GPA fell below these requirements, the Academic Standing Committee could submit a recommendation for academic dismissal from the program.  D. 32 ¶¶ 4, 8; D. 35 ¶¶ 4, 8.  Additionally, in the pre-professional phase, courses could not be attempted more than two times.  D. 32 ¶ 9; D. 35 ¶ 9.

Upon commencement of each academic year, MCPHS requires each student to review the Student Handbook ("Handbook") and confirm acknowledgement of its policies and procedures. D. 32 ¶ 12; D. 35 ¶ 12.  The Handbook specifies that MCPHS is required to comply with the ADA and complies with the ADA and the Rehabilitation Act.  D. 35 ¶¶ 99-100; D. 40 ¶¶ 99-100.  The Handbook outlines a procedure for students wishing to request an accommodation for any "physical, psychological, and learning or other disability" through the Office of Student Access and Accommodation ("OSAA").  D. 32 ¶ 14; D. 35 ¶ 14.  OSAA helps students with disabilities in "fulfilling the fundamental requirements of the curriculum by providing reasonable accommodations."  D. 32 ¶ 15; D. 35 ¶ 15.  The Handbook states that students wishing to request accommodations "can schedule a meeting with [OSAA] to review their documentation and determine their accommodations."  D. 32-4 at 75.  "Those students requesting academic accommodations must first submit a copy of a recent evaluation, assessment, or report completed by a qualified professional" which "should include a diagnosis, the impact of the disability on the student's learning, the credentials of the evaluator, and recommendations for accommodations." Id.; see D. 32 ¶ 16; D. 35 ¶ 16.  If a student approaches OSAA with a medical disability, OSAA is

required to meet and engaged with the student under an "interactive process."  D. 32 ¶ 19; D. 35 ¶ 19.  OSAA does not have a written policy or procedure that requires a faculty or administrative member to inform and report to OSAA a student's perceived medical disability.  D. 32 ¶ 20; D. 35 ¶ 20.  A MCPHS employee can, however, provide OSAA with a "student of concern" form in the event they perceive a difficulty a student may be having in any manner.  Id.

During his first year of the PharmD Program (Fall 2016-Spring 2017), Finnegan obtained a cumulative GPA of 2.26.  D. 32 ¶ 51; D. 35 ¶ 51.  By the end of the Fall 2017 semester of his second year, Finnegan failed Foundations in Physics I and received a cumulative GPA of 2.29.  D. 32 ¶ 53; D. 35 ¶ 53.  On December 21, 2017, Finnegan received his first academic dismissal from the PharmD Program.  D. 32 ¶ 56; D. 35 ¶ 56.  Finnegan appealed his dismissal with a letter of appeal on January 1, 2018.  D. 32 ¶ 57; D. 35 ¶ 57; D. 32-24 at 3.  The letter did not indicate that Finnegan suffered from any chronic illness or disability during either of the preceding years.  D. 32-24 at 3; see D. 35-1 at 50.  On January 8, 2018, MCPHS reversed its academic dismissal decision and placed Finnegan on academic probation.  D. 32 ¶ 58; D. 35 ¶ 58; D. 32-25 at 2-3.  The requirements of Finnegan's academic probation included (i) repeating another year in the pre-professional phase of the PharmD Program (now a year behind his enrollment class), (ii) retaking Foundations of Physics I, and (iii) maintaining a minimum cumulative GPA of 2.7 or higher by the Spring 2019 semester.  D. 32 ¶ 59; D. 35 ¶ 59.  Finnegan was also advised that a withdrawal from any course would constitute a failure.  D. 32 ¶ 60; D. 35 ¶ 60.  Finnegan continued onto his Spring 2018 semester under this academic probation, D. 32 ¶ 61; D. 35 ¶ 61, and subsequently withdrew from Organic Chemistry II and ended the year with a cumulative GPA of 2.36, in violation of his academic probation, D. 32 ¶¶ 61-62; D. 35 ¶¶ 61-62.  On May 7, 2018, Finnegan received his second academic dismissal from the PharmD Program.  D. 32 ¶ 63; D. 35 ¶ 63.

Finnegan again appealed and MCPHS reversed its dismissal on June 19, 2018, keeping Finnegan on academic probation which now required that Finnegan (i) retake Organic Chemistry II, and (ii) maintain a minimum cumulative GPA of 2.7 or higher by the Spring 2019 semester.  D. 32 ¶¶ 64-65; D. 35 ¶¶ 64-65; D. 32-27 at 2-3.

Finnegan continued onto his third year at MCPHS (Fall 2018-Spring 2019) in the pre-professional phase of the PharmD Program.  D. 32 ¶ 67; D. 35 ¶ 67.  During that year, Finnegan received a "D" in Organic Chemistry II and obtained a cumulative GPA of 2.64, resulting in his third academic dismissal on May 7, 2019.  D. 32 ¶¶ 68-69; D. 35 ¶¶ 68-69.  Finnegan again appealed his dismissal with a letter of appeal "explain[ing] [his] circumstances" during that academic year. D. 32-29 at 3; see D. 32 ¶ 70; D. 35 ¶ 70.  The letter did not indicate that Finnegan suffered from any chronic illness or disability.  Id.; see D. 35-1 at 59-60.   On June 19, 2019, MCPHS reversed its decision and allowed Finnegan to proceed into the professional phase of the PharmD Program under academic probation requiring him to maintain a cumulative GPA of 2.7 or higher.  D. 32 ¶¶ 71-72; D. 35 ¶¶ 71-72; D. 32-30.  Finnegan ended his fourth year at MCPHS (Fall 2019-Spring 2020) with a "D" in Physiology/Pathophysiology I and a "No Credit" in Physiology/Pathophysiology II, both required courses in the professional phase of the PharmD Program, and a cumulative GPA of 2.64, in violation of his academic probation.  D. 32 ¶¶ 74-75; D. 35 ¶¶ 74-75.  Although the MCPHS Academic Standing Committee recommended that Finnegan be academically dismissed from the PharmD Program following this fourth year, the then-Interim Dean of the School of Pharmacy permitted Finnegan to continue in the PharmD Program so long as he (i) maintained a cumulative GPA of 2.7 or higher, (ii) met with the Associate Dean of Student Engagement and Success, Steven Crosby ("Dean Crosby") to review academic requirements and class scheduling, and (iii) developed an Academic Success Plan with the Center

for Academic Student Enrichment.  D. 32 ¶¶ 76-77; D. 35 ¶¶ 76-77; D. 32-31.  Finnegan continued onto his fifth academic year (Fall 2020-Spring 2021) enrolled in the PharmD Program under the parameters of this academic probation.  D. 32 ¶ 78; D. 35 ¶ 78.

In accordance with his Fall 2020-Spring 2021 academic probation, Finnegan met with Dean Crosby to review the PharmD Program requirements and schedule classes.  D. 32 ¶ 80; D. 35 ¶ 80; see D. 32-1.  According to MCPHS, during one of these meetings in late Fall 2020 or early 2021, Finnegan disclosed to Dean Crosby for the first time that he was experiencing migraines.  D. 32 ¶¶ 21, 81.[1]  At this time, Finnegan had a doctor's note verifying his excused absence from several classes in October 2020 ("October 2020 doctor's note").  D. 32 ¶ 23; see D.

---

[1] Finnegan disputes MCPHS's assertion that he initially informed Dean Crosby that he was experiencing migraines in Fall 2020, and represents that he first told Dean Crosby that he was experiencing migraines "in Fall 2018." D. 35 ¶¶ 21, 104; but see D. 35 ¶ 81 (not disputing that he "expressed concerns for the first time, regarding his migraine condition" to Dean Crosby in the fall 2020). On a motion for summary judgment, "when the parties tell two different stories . . . we typically must view the facts and draw all reasonable inferences in the non-movant's favor." Campos v. Van Ness, 711 F. 3d 243, 245 (1st Cir. 2013) (citation omitted). "[H]owever, . . . where the non-movant's account 'is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Id. (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). Here, MCPHS cites Dean Crosby's deposition testimony that Finnegan told him he was experiencing migraines in approximately "late 2020 or . . . into 2021." D. 32-8 at 3; see D. 32 ¶¶ 21, 81. In response, Finnegan cites his own deposition testimony suggesting that he met with Dean Crosby and submitted documentation of his migraines in Fall 2018. D. 35-1 at 41; see D. 35 ¶ 104. As MCPHS notes, D. 40 ¶ 104, however, Finnegan recanted this testimony later in the same deposition:

> "I think I might have mistakenly said it earlier. It's been so long that I think I confused the dates. Just looking back at the timeline after you gave me [the October 2020 doctor's note], I'm not a hundred percent sure when [the migraines] started . . . I don't know if it went back as early as 2018."

D. 35-1 at 47; see id. at 58 (testifying that his migraines "happened in the springtime of a year, and then that fall is when I address it to Dean Crosby. I do not remember a specific date. I was getting confused earlier"). Given Finnegan's repudiation of his earlier testimony that he first informed Dean Crosby of his condition in Fall 2018 and his repeated testimony that he could not remember the date on which he first told Dean Crosby of his condition, he has not shown that there is a disputed issue of material fact as to this matter. See Harriman v. Hancock Cnty., 627 F.3d 22, 34 (1st Cir. 2010); Campos, 711 F.3d at 245.

32-9.[2]  The note, addressed to Dean Crosby, stated that Finnegan was seen at the doctor's office on October 20, 2020 "to discuss migraine headaches" and that Finnegan would be meeting with Dean Crosby that afternoon "to discuss a plan for missing classes or exams due to migraine headaches."  D. 32-9 at 2.  The note disclosed that Finnegan's migraines "can be debilitating significantly enough such that he may miss a class or an exam" and noted that Finnegan missed a test on October 9, 2020 that he planned to make up.  Id.  The note further stated:

> "For the future, please allow [Finnegan] to arrange his make up tests staggered on different days.  The stress of trying to make up the tests all on one day could certainly cause a migraine."

Id.  Dean Crosby did not recommend that Finnegan seek assistance from OSAA at this meeting. D. 32 ¶ 22; D. 35 ¶ 22.  At a subsequent meeting shortly thereafter, Finnegan and Dean Crosby continued to discuss concerns as related to Finnegan's migraines and academic difficulties.  D. 32 ¶ 24; D. 35 ¶ 24.  At this point, Dean Crosby advised Finnigan to seek assistance with OSAA, id., and also provided Finnegan with "structural suggestions on how to study and retain pharmacology concepts," and recommended that Finnegan work with the Center for Academic Success and Enrichment and take advantage of the Peer-Tutoring services offered through MCPHS, D. 32 ¶ 82; D. 35 ¶ 82.  Finnegan did not meet with OSAA to discuss and register his migraine condition following this meeting.  D. 32 ¶ 26; D. 35 ¶ 26.

On November 11, 2020, Finnegan submitted a Document Absence Request for missing several classes in November due to his "chronic migraine issue."  D. 32 ¶ 28; D. 35 ¶ 28; see D. 32-10 at 2-3.  Following his submission, then-Assistant Dean of Students (Division of Student

---

[2] Finnegan disputes this assertion on the same timeframe ground as discussed above, *supra* note 1.  See D. 35 ¶ 23 (citing D. 35-1 at 41).  This testimony does not establish a genuine dispute of material fact as to the timeframe for same for the reasons discussed *supra* note 1 and where the note itself reflects Finnegan's October 20, 2020 doctor's office visit to discuss migraines.  D. 32-9.

Affairs) Andreana Pavlos ("Dean Pavlos") contacted OSAA to reach out to Finnegan.  D. 32 ¶ 29; D. 35 ¶ 29; D. 32-13 at 2.  OSAA messaged Finnegan the next day, explaining that the Dean of Students Office shared his name with OSAA and asked that OSAA provide him information regarding registering with OSAA in the event that he needed their support.  D. 32 ¶ 30; D. 35 ¶ 30. OSAA told Finnegan to respond to the message if he felt that it would be helpful to discuss possible services with the OSAA office and OSAA would then schedule an informational appointment with Finnegan.  Id.  Finnegan never contacted OSAA to schedule a meeting.  D. 32 ¶ 31; D. 35 ¶ 31. On November 18, 2020, OSAA Assistant Director Bridget Sullivan ("Sullivan") called Finnegan to discuss his migraine condition and left him a voicemail to which Finnegan never responded.  D. 32 ¶¶ 32-33; D. 35 ¶¶ 32-33.  By the end of that Fall 2020 semester, Finnegan failed several more required courses in the PharmD Program.  D. 32 ¶ 79; D. 35 ¶ 79.

On February 16, 2021, during his Spring 2021 semester, Finnegan submitted a second Document Absence Request for missing class and an exam on February 9, 2021 due to a "[c]hronic migraine issue."  D. 32 ¶ 37; D. 35 ¶ 37; see D. 32-11 at 2-3.  The next day, an OSAA Assistant Manager called Finnegan to schedule an informational appointment with OSAA regarding the migraine he disclosed in the Document Absence Request, but was unable to leave a voicemail.  D. 32 ¶ 38; D. 35 ¶ 38.  Later that day, Dean Pavlos emailed Finnegan to confirm that he received Finnegan's Document Absence Request and told him that "[i]f you are managing a medical concern that is impacting your academics periodically you can meet with the [OSAA] . . . to further support you."  D. 32 ¶ 39; D. 35 ¶ 39; D. 32-19 at 2.  In response, Finnegan emailed Dean Pavlos a screenshot of his October 2020 doctor's note.  D. 32 ¶ 40; D. 35 ¶ 40; see D. 32-20 at 3.  Dean Pavlos followed up and stated that "OSAA works with students with medical impairments (like migraines) and they would keep [his] medical documentation on file to create a plan to best support

you similar to what your providers outlined in the [October 2020 doctor's note]."  D. 32 ¶ 41; D. 35 ¶ 41; D. 32-20 at 2.  On February 18, 2021, Sullivan again reached out to Finnegan to schedule a meeting to discuss how OSAA could "best support" him.  D. 32 ¶ 42; D. 35 ¶ 42; D. 32-14 at 3. Another OSAA employee also attempted to reach out to Finnegan and was unable to leave a voicemail.  D. 32 ¶ 43; D. 35 ¶ 43.  Finnegan did not response, register his medical condition with OSAA, nor consult the Handbook to seek guidance on requesting accommodations at this time. D. 32 ¶¶ 44-45; D. 35 ¶¶ 44-45.

On March 16, 2021, Finnegan submitted his third Document Absence Request for missing a class due to a "[c]hronic migraine issue."  D. 32 ¶ 46; D. 35 ¶ 46; D. 32-12 at 2-3.  On March 18, 2021, Dean Pavlos emailed Finnegan requesting that he connect with OSAA to solidify next steps in creating a plan for possible accommodations.  D. 32 ¶ 47; D. 35 ¶ 47.  Finnegan did not contact or otherwise register with OSAA to request any type of accommodation following this outreach. D. 32 ¶ 48; D. 35 ¶ 48.  By the end of the Spring 2021 semester, Finnegan failed several additional required courses in the PharmD Program and obtained a cumulative GPA of 2.32, in violation of his academic probation.  D. 32 ¶¶ 83-84; D. 35 ¶¶ 83-84.  Finnegan returned for the Fall 2021 semester during which he remained under academic probation, received unsatisfactory grades in three courses and obtained a cumulative GPA of 2.14.  D. 32 ¶¶ 85-87; D. 35 ¶¶ 85-87.

On December 16, 2021, Finnegan was academically dismissed from the PharmD Program for the fourth and final time.  D. 32 ¶ 88; D. 35 ¶ 88; see D. 32-32 at 2-3.  On January 5, 2022, in response to an email from Finnegan regarding course registration, Dean Crosby informed him of the December 2021 dismissal letter and advised him to promptly change his major.  D. 32 ¶ 89; D. 35 ¶ 89; D. 32-33 at 2.  Finnegan met with Dean Crosby the following week to discuss his dismissal.  D. 32 ¶ 90; D. 35 ¶ 90.  MCPHS did not reverse its decision to dismiss Finnegan

9

following this meeting.  D. 32 ¶ 91; D. 35 ¶ 91.  On March 3, 2022, Finnegan and his father met with MCPHS to discuss Finnegan's academic record.  D. 32 ¶¶ 92-93; D. 35 ¶¶ 92-93.  During that meeting, Finnegan questioned why he was not referred to or otherwise offered a leave of absence regarding his migraine condition, to which MCPHS detailed OSAA's multiple outreach attempts.  D. 32 ¶ 94; D. 35 ¶ 94.  On March 9, 2022, MCPHS informed Finnegan that his academic dismissal from the PharmD Program was final but advised him that he was eligible for other academic programs at MCPHS.  D. 32 ¶¶ 95, 98; D. 35 ¶¶ 95, 98.

## IV.    Procedural History

Finnegan filed a five-count complaint against MCPHS on December 6, 2023.  D. 1.  On November 13, 2024, the Court denied MCHPS's motion to dismiss Counts I (Rehabilitation Act claim) and II (ADA claim) and allowed same as to the other three claims.  D. 15.  On October 31, 2025, Defendants now has moved for summary judgment as to the remaining claims.  D. 30.

## V.    Discussion

### A.    Counts I and II: Violations of Section 504 of the Rehabilitation Act and the ADA

In Counts I and II, Finnegan challenges his dismissal from MCPHS's PharmD Program and alleges that MCPHS violated the anti-disability discrimination provisions under the Rehabilitation Act and the ADA by failing to provide him with accommodations for his migraines. See D. 1 ¶¶ 92-123.  Both the ADA and Section 504 of the Rehabilitation Act prohibit discrimination on the basis of disability.  29 U.S.C. § 794(a); 42 U.S.C. § 12182(a); see D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 39-40 (1st Cir. 2012).  Courts have recognized that "[t]he ADA and Section 504 of the Rehabilitation are 'frequently read in sync,'" Brown v. Suffolk Univ., No. 19-cv-40062-DHH, 2021 WL 2785047, at *4 (D. Mass. Mar. 31, 2021) (quoting Guckenberger v. Boston Univ., 974 F. Supp. 106, 133 (D. Mass. 1997)), and are "generally

governed by the same standards," id. at *4 (citing D.B. ex rel. Elizabeth B., 675 F. 3d at 39-40). "In the context of a student excluded from an educational program, to prove a violation of either the ADA or Rehabilitation Act, the plaintiff must establish that: (1) he is disabled, (2) he is otherwise qualified to participate in the defendant's program, and (3) defendant excluded him from its program based on his disability." Joseph M. v. Becker Coll., 531 F. Supp. 3d 383, 395 (D. Mass. 2021) (citing Parker v. Universidad de Puerto Rico, 225 F. 3d 1, 5 (1st Cir. 2000)). As to the third element, there are three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. See Nunes v. Massachusetts Dep't of Correction, 766 F.3d 136, 144-45 (1st Cir. 2014). Finnegan's discrimination claim under both statutes relies upon a failure to accommodate theory. See D. 1 ¶¶ 92-123. MCPHS moves for summary judgment on the grounds that Finnegan never made a request to MCPHS for any accommodation related to his disability and Finnegan was not "otherwise qualified" to participate in MCPHS's PharmD Program. D. 31 at 19-25.

1.    *The Only Accommodation that Finnegan Requested Was for Staggered Testing*

For a reasonable accommodation claim, a student's "request must be 'sufficiently direct and specific,' giving notice that [he] needs a 'special accommodation.'" Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (quoting Wynne v. Tufts Univ., 976 F.2d 791, 795 (1st Cir. 1992) (Wynne II). The undisputed record establishes that Finnegan made a request for a reasonable accommodation in October 2020 to take make up tests on staggered days, D. 32-9 (October 2020 doctor's note), but did not seek any other accommodation. Despite Finnegan's suggestions to the contrary, D. 34 at 10-13, Finnegan fails to identify any other specific request for accommodation, see id. Finnegan's suggestion that he requested a leave of absence, see id. at 6, 11, is unsupported by the record, see D. 35-1 at 65 (Finnegan confirming in his deposition that

11

he did not ask for a leave of absence); see also D. 32 ¶ 94; D. 35 ¶ 94.[3]  Additionally, Finnegan's

generalized contention that Dean Crosby made "affirmative statements . . . to secure

accommodations for [him]," D. 34 at 11, does not suffice to establish a request for a specific

accommodation.   See Brown, 2021 WL 2785047, at *4 (noting that "neither the ADA nor

Rehabilitation Act requires a university or its employees to investigate and identify a reasonable

accommodation for a student with a disability absent a request"); see also Reed, 244 F. 3d at 261

(noting that a defendant "has no duty to divine the need for a special accommodation where the

[plaintiff] merely makes a mundane request" for an accommodation).  Although Finnegan asserts

more specifically that Dean Crosby "promised that he would 'take care of' the necessary

paperwork for . . . withdrawals," D. 34 at 6 (citing D. 35 ¶ 112), as MCPHS notes, D. 40 ¶ 112,

the evidence upon which Finnegan relies does not establish that Dean Crosby promised to

complete the necessary paperwork for Finnegan to withdraw from courses in relation to his

migraine condition, see D. 35 ¶ 112 (citing D. 35-1 at 44), and Finnegan's assertion otherwise is

not based on a reasonable inference, see Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014)

(noting that "[a]lthough [the reviewing court] will draw all reasonable inferences in the

nonmovant's favor, [the court] will not draw *unreasonable inferences* or credit bald assertions,

empty conclusions, rank conjecture, or vitriolic invective") (emphasis in original).  To the extent

---

[3] Even if the record supported that he had made a specific accommodation request for a leave of absence, Finnegan fails to point to any record evidence tending to show that this unrequested "leave of absence of unspecified length . . . 'would be temporary and would allow h[is] physician to design an effective treatment program'" for his migraines.  See Rose v. Laskey, 110 F. App'x 136, 138 (1st Cir. 2004) (quoting Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998)); see Henry v. United Bank, 686 F.3d 50, 61 (1st Cir. 2012) (noting that an "open-ended request for additional leave is just the type of wait-and-see approach that has been rejected as giving rise to a triable issue on reasonable accommodation"); see also Sarkisian v. Austin Prep. Sch., 646 F. Supp. 3d 174, 186 (D. Mass. 2022) (concluding that teacher failed to establish that her request for an open-ended leave of absence was a reasonable accommodation where the leave "would not allow [her] to perform an essential function of job, namely attending to her school duties").

Finnegan suggests he requested to transfer course grades from a different university into his GPA calculation, see D. 34 at 5-6, Finnegan provides no indication that this alleged request was related to his migraines, see Reed, 244 F.3d at 261 (noting that, "[a]t the least, the request must explain how the accommodation requested is linked to some disability"), but even if it were, this request is not a reasonable accommodation.  See Guckenberger, 974 F. Supp. at 149 (noting that "neither the ADA nor the Rehabilitation Act require a university to provide course substitutions that the university rationally concludes would alter an essential part of its academic program"); DMP v. Fay Sch. ex rel. Bd. of Trs., 933 F. Supp. 2d 214, 222 (D. Mass. 2013) (noting that "[school] is not required to compromise the integrity of the school's . . . academic requirements in order to 'accommodate' a student's disability").  Accordingly, the record establishes that Finnegan made a sufficiently direct request only for an accommodation to take make up tests on staggered days.

<ol start="2" type="i" style="list-style-type: none;">
<li>2.    *Finnegan Was Not Otherwise Qualified To Participate In The PharmD Program*</li>
</ol>

Even assuming *arguendo* that MCPHS failed to accommodate Finnegan's accommodation to make up tests on staggered days, the undisputed record establishes that Finnegan was not otherwise qualified to participate in the PharmD Program because of his poor academic performance.  "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."  Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 22 (1st Cir. 1991) ("Wynne I") (internal quotation marks and citation omitted).  In the context of whether a plaintiff is "otherwise qualified" to participate in an academic program, "'a certain degree of deference is owed to the judgment of an academic institution" because "a university is entitled to wide discretion in making judgments as to the academic performance of its students, so long as its behavior is not so arbitrary or irrational as to not constitute an exercise of professional judgment.'"

Joseph M., 531 F. Supp. 3d at 397 (quoting Shulse ex rel. Shulse v. W. New England Univ., No. 19-cv-30146-KAR, 2020 WL 4474274, at *6 (D. Mass. Aug. 4, 2020)).

a)      <u>Finnegan failed to meet the PharmD Program's requirements</u>

MCPHS argues that Finnegan's poor academic performance demonstrates that he could not perform the essential functions of a PharmD Program student. D. 31 at 23-25. It is undisputed that Finnegan never attained the 2.7 cumulative GPA required for him to be in "good academic standing" during any academic year in which he was enrolled in the PharmD Program. D. 32 ¶¶ 51, 53, 61, 68, 75, 84, 87; D. 35 ¶¶ 51, 53, 61, 68, 75, 84, 87; see D. 32 ¶¶ 2-3, 5,7; D. 35 ¶¶ 2-3, 5, 7. Finnegan also failed, received an unsatisfactory grade or withdrew from several classes that were required components of the PharmD Program. D. 32 ¶¶ 53, 61, 68, 74, 83, 86; D. 35 ¶¶ 53, 61, 68, 74, 83, 86; see D. 32 ¶¶ 2-10; D. 35 ¶¶ 2-10.[4] MCPHS's Academic Standing Committee recommended Finnegan's dismissal from the PharmD Program multiple times due to this poor academic performance, D. 32 ¶¶ 56, 63, 69, 76, 88; D. 35 ¶¶ 56, 63, 69, 76, 88, and Finnegan was dismissed from the program three times prior to his fourth and final dismissal on December 16, 2021, D. 32 ¶¶ 56, 63, 69, 88; D. 35 ¶¶ 56, 63, 69, 88. In short, it is undisputed that Finnegan's academic performance fell below the PharmD Program's academic parameters during the entirety of his enrollment. See D. 32-5 at 2-4. The record thus establishes that Finnegan failed to meet the

---

[4] In the factual background section of his opposition, Finnegan suggests that MCPHS improperly marked grades for courses from which he withdrew in his Fall 2020 semester as an "F" on his transcript instead of a "W" and that this alleged error formed the basis of his dismissal in December 2021. D. 34 at 6-7. Finnegan does not, however, dispute the fact that he received an "F" in these courses or that he was dismissed in December 2021 "[a]s a result" of his failed courses and unsatisfactory cumulative GPA in his response to MCPHS's statement of facts, see D. 35 ¶¶ 79-88, nor does he offer any evidence in the record to suggest that MCPHS processed these grades incorrectly, see Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 276 (1st Cir. 2002) (explaining that party opposing summary judgment must "affirmatively point to specific facts that demonstrate the existence of an authentic dispute") (internal quotation marks omitted) so Finnegan has failed to show that there is a genuine dispute of material fact as to this matter.

14

PharmD Program's requirements.  Murphy v. Franklin Pierce L. Ctr., No. 95-cv-1003, 1995 WL 325791, at *4 (1st Cir. May 31, 1995) (unpublished opinion) (concluding that student was not otherwise qualified to participate in academic program where she "failed to comply with the generally applied academic provision[s]"); el Kouni v. Trs. of Bos. Univ., 169 F. Supp. 2d 1, 4 (D. Mass. 2001) (concluding that student could not meet requirements of his MD program where he received multiple unsatisfactory grades).

Finnegan's argument that MCPHS's reversals of its dismissal decisions in December 2017, May 2018 and May 2019 and the Interim Dean's decision to decline to accept the Academic Standing Committee's recommendation to dismiss him in August 2020 establishes that he was otherwise qualified to participate in the program, D. 34 at 14-15; see D. 32 ¶¶ 58-59, 64-65, 71-73, 76-77; D. 35 ¶¶ 58-59, 64-65, 71-73, 76-77, fails.  Finnegan ignores the undisputed fact that he consistently violated the terms of his academic probation upon which MCPHS's dismissal reversals were contingent by failing to meet the cumulative GPA requirement and complete required components of the PharmD Program satisfactorily.  D. 32 ¶¶ 61-62, 68, 74-75, 79, 83-86; D. 35 ¶¶ 61-62, 68, 74-75, 79, 83-86.  Finnegan's failure to meet the terms of the academic probation upon which his enrollment was contingent further demonstrates that he was not otherwise qualified to participate in the PharmD Program.  See Axelrod v. Phillips Acad., Andover, 46 F. Supp. 2d 72, 83 (D. Mass. 1999) (concluding that student was not otherwise qualified where he failed to meet the requirements of his academic probation); Saxena v. Univ. of Massachusetts Med. Sch., No. 19-cv-40007-TSH, 2023 WL 6390053, at *25 (D. Mass. Sept. 28, 2023) (concluding same).  Finnegan's argument also fails to acknowledge that MCPHS did not reverse its fourth and final decision to dismiss him in December 2021.  D. 32 ¶¶ 88-95; D. 35 ¶¶ 88-95.

15

Given Finnegan's prolonged deficient academic performance, MCPHS's decision to dismiss Finnegan is entitled to deference.  See Joseph M., 531 F. Supp. 3d at 397.

> b)      Finnegan has not established that he could meet the PharmD Program's requirements even with a reasonable accommodation

Although Finnegan acknowledges his poor academic performance, he contends that "there are genuine disputes of material fact regarding whether [his] academic difficulties were caused by his disability and lack of accommodations."  D. 34 at 14.  When determining if a student is otherwise qualified, "it is necessary to take into account the extent to which reasonable accommodations that will satisfy the legitimate interests of both the school and the student are (or are not) available and, if such accommodations exist, the extent to which the institution explored those alternatives."  Wynne II, 976 F. 2d at 792.  The student has the burden to show that they are "capable of satisfying the academic and technical requirements set by the [school] with the help of reasonable accommodations."   Murphy, 1995 WL 325791, at *3 (citation omitted). "Reasonable accommodations are those which do not require a modification of the essential nature of the program or impose an undue burden on the recipient of federal funds."  Shulse ex rel. Shulse, 2020 WL 4474274, at *6.

The record does not establish that Finnegan could have met the academic requirements of the PharmD Program and the terms of his academic probation with reasonable accommodation. As explained above, Finnegan's only requested accommodation was to take make-up exams on staggered days.  Even if, assuming *arguendo*, that this was a reasonable accommodation that MCPHS failed to provide, Finnegan does not explain how this accommodation, not requested until October 2020, would have allowed him to meet the academic requirements of the PharmD Program and the terms of his academic probation.  From that time period forward, Finnegan's academic probation required him to, among other things, develop an Academic Success Plan with the Center

16

for Academic Student Enrichment.  D. 32 ¶¶ 76-78; D. 35 ¶¶ 76-78.  Finnegan does not point to any evidence on the record that he did so, nor does he contend he was unable to do so because of his disability.  See Axelrod, 46 F. Supp. 2d at 83 (concluding that student was not otherwise qualified to participate in educational program where he was placed on academic probation, "explicitly told what he had to do in order to remain at [the school], and he failed to perform as required").    This failure alone is sufficient to establish that Finnegan was not qualified to participate in the PharmD Program, even with the requested accommodation.

Finnegan's contention that there are genuine disputes regarding whether his poor academic performance was caused by his disability and lack of accommodations, D. 34 at 14, cannot save his claim.  It is undisputed that Finnegan failed several required courses in the PharmD Program and never attained a cumulative GPA of 2.7 or higher, which not only violated the terms of his academic probation but also fell below the PharmD Program's general academic requirements.  D. 32 ¶¶ 74-75, 79, 83-87; D. 35 ¶¶ 74-75, 79, 83-87.  Although the parties debate the reasons for his class absences and course failures, compare, D. 40 ¶ 120 with D. 35 ¶¶ 118-20, the relevant inquiry for whether Finnegan was an otherwise qualified PharmD Program student is whether a reasonable accommodation would have allowed him to meet the program's requirements and the terms of his academic probation despite his disability.  See Wynne I, 932 F.2d at 22; Wynne II, 976 F.2d at 792.  That is, Finnegan still has the burden to establish that a reasonable accommodation would have allowed him to meet the PharmD Program's academic requirements and the terms of his probation "*in spite of* his handicap."  See Axelrod, 46 F. Supp. 2d at 83 (emphasis in original and citation omitted).

Here, Finnegan fails to show how taking make-up exams on staggered days, as of October 2020, would have allowed him to meet the requirements of the PharmD Program.  See Murphy,

17

1995 WL 325791, at *4 (rejecting argument that student who could not meet academic requirements of her educational program was otherwise qualified where student failed to show that "her performance would have improved through [her requested accommodation]").

For the above reasons, MCPHS is entitled to summary judgment on Counts I and II.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS MCPHS's motion for summary judgment as to Counts I and II.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge